IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

LISA L. GARRETT,              )
                              )
            Plaintiff,        )
                              )
    v.                        )    Case No.
                              )    04-5067-CV-SW-REL-SSA
JO ANNE BARNHART, Commissioner )
of Social Security,           )
                              )
            Defendant.        )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Lisa Garrett seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for a period of disability and
disability insurance benefits under Title XVI of the Social
Security Act ("the Act").  Plaintiff argues that (1) the ALJ
erred in not giving controlling weight to the opinions of
plaintiff's treating physicians (Dr. Mark Schultz and Dr.
Diane Cornelison), (2) the ALJ erred in failing to find that
plaintiff's spinal impairment met a listed impairment, (3)
the ALJ erred in relying on the report of a non-examining,
non-physician in determining plaintiff's residual functional
capacity, (4) the ALJ erred in failing to properly consider
plaintiff's credibility, and (5) the ALJ erred in
substituting her own medical opinion in place of the opinion
of plaintiff's treating physicians.  I find that the ALJ

properly found plaintiff not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On May 7, 2002, plaintiff applied for a period of disability and disability insurance benefits alleging that she had been disabled since April 1, 2002. Plaintiff's disability stems from lumbar spine degenerative disc disease, bronchitis, and an affective disorder. Plaintiff's application was denied on August 1, 2002. On December 9, 2003, a hearing was held before an Administrative Law Judge. On March 26, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On June 1, 2004, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401

2

(1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have

3

supported an opposite decision." Id.; Clarke v. Bowen, 843
F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the
burden of proving she is unable to return to past relevant
work by reason of a medically-determinable physical or
mental impairment which has lasted or can be expected to
last for a continuous period of not less than twelve months.
42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that
she is unable to return to past relevant work because of the
disability, the burden of persuasion shifts to the
Commissioner to establish that there is some other type of
substantial gainful activity in the national economy that
the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853,
857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974
(W.D. Mo. 2000).

The Social Security Administration has promulgated
detailed regulations setting out a sequential evaluation
process to determine whether a claimant is disabled. These
regulations are codified at 20 C.F.R. §§ 404.1501, et seq.
The five-step sequential evaluation process used by the
Commissioner is outlined in 20 C.F.R. § 404.1520 and is
summarized as follows:

4

1.   Is the claimant performing substantial gainful activity?

                Yes = not disabled.
                No = go to next step.

        2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

                No = not disabled.
                Yes = go to next step.

        3.   Does the impairment meet or equal a listed impairment in Appendix 1?

                Yes = disabled.
                No = go to next step.

        4.   Does the impairment prevent the claimant from doing past relevant work?

                No = not disabled.
                Yes =  go to next step where burden shifts to Commissioner.

        5.   Does the impairment prevent the claimant from doing any other work?

                Yes = disabled.
                No = not disabled.

**IV.   THE RECORD**

        The record consists of the testimony of plaintiff and vocational expert Cathy Hodgson, in addition to documentary evidence admitted at the hearing.

**A.    ADMINISTRATIVE REPORTS**

        The record contains the following administrative reports:

5

**Earnings Record**

The record establishes that plaintiff earned the following income from 1976 through 2000:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1976 | $     392.53 | 1989 | $ 2,268.10 |
| 1977 | 537.25 | 1990 | 9,166.62 |
| 1978 | 1,743.87 | 1991 | 3,894.12 |
| 1979 | 291.50 | 1992 | 0.00 |
| 1980 | 1,053.60 | 1993 | 0.00 |
| 1981 | 0.00 | 1994 | 4,691.87 |
| 1982 | 0.00 | 1995 | 248.64 |
| 1983 | 2,316.83 | 1996 | 0.00 |
| 1984 | 3,286.22 | 1997 | 0.00 |
| 1985 | 0.00 | 1998 | 0.00 |
| 1986 | 1,823.37 | 1999 | 8,653.74 |
| 1987 | 160.37 | 2000 | 4,403.01 |
| 1988 | 2,952.53 | | |

(Tr. at 45-46).

**Claimant Questionnaire**

In her Claimant Questionnaire dated June 6, 2002, plaintiff stated that when she sits up straight she has pain in her lower back, hip, and left leg (Tr. at 70). She uses an ice pack on her lower back and is in bed most of the day and night (Tr. at 70). When asked to describe any reasons

6

she does not take her medication as prescribed, plaintiff wrote, "Can't afford to get some of them filled right now." (Tr. at 70).

She reported that she cannot clean her house, cook, or do dishes, and that she is not supposed to lift anything (Tr. at 71). She watches television all day and she reads her bible every morning with no problems doing either (Tr. at 72). She rides to church with her husband and the service is about an hour long (Tr. at 72).

**Letter to Whom it May Concern**

At some point in 2003 (the month and date were cut off during copying), Joyce Marie Lear, who appears from the text of the letter to be plaintiff's sister, wrote a letter to whom it may concern (Tr. at 91-92). She stated that she accompanied plaintiff to an appointment with Dr. Cornelison on January 30, 2003 (Tr. at 91). Dr. Cornelison stated that plaintiff was "not fixable" and that she was abusing her medicine. Ms. Lear told Dr. Cornelison that plaintiff is indeed fixable and has not been abusing her medicine. "Dr. Cornelison became angry and upset with me and finally gave Lisa some names of specialists. . . Dr. Cornelison during

Case 3:04-cv-05067-REL   Document 17   Filed 08/16/05   Page 7 of 85

the exam was rude and abrupt and was very pissy. . . . In my opinion, if the doctors can't help her, then, she (Lisa) should get disability." (Tr. at 91-92).

**B.  SUMMARY OF MEDICAL RECORDS**

On August 28, 2000, plaintiff saw Mark Schultz, M.D., and reported that she had recently slipped in the tub and had some discomfort in her sacroiliac joint (Tr. at 106). Dr. Schultz gave plaintiff samples of Celebrex.

On September 1, 2000, plaintiff again saw Dr. Schultz for a follow up on a finger lesion (Tr. at 105-106). She reported that her myofascial strain and right sacroiliac joint strain were resolved.

On March 27, 2002, plaintiff saw Dr. Schultz for recurring problems with her left hip over the preceding three weeks (Tr. at 104-105). "She does not recall any specific event where she injured herself but she does help her husband, goes up and down ladders. Really doesn't do much lifting but does do a lot of physical labor. . . . She does unfortunately continue to smoke against medical advice." Dr. Schultz assessed acute myofascial strain and spasm. He ordered x-rays and prescribed Flexeril (a muscle relaxant), Diclofenac (non-steroidal anti-inflammatory), and Vicodin (narcotic pain reliever), and told her to alternate

8

using heat and ice. "Relative rest."

The following day, on March 28, 2002, plaintiff saw Lynn Carlton, M.D., who took x-rays of plaintiff's pelvis, left hip, and lumbar spine (Tr. at 111-112, 124-125). It was a negative study of the pelvis, negative study of the left hip, minimal degenerative change of the lumbar spine, negative for limitation of motion on flexion or extension.

April 1, 2002, is plaintiff's alleged onset date.

On April 2, 2002, Dr. Schultz notified plaintiff of the test results (Tr. at 104). He told her that she had a negative study of the pelvis, negative left hip, and minimal degenerative changes of the lumbosacral spine. He directed her to continue her medication as directed.

On April 4, 2002, plaintiff saw Dr. Schultz for a follow up (Tr. at 103). She complained of left lower back pain and hip pain, at times radiating into her left leg. "It is not constant but at times she does have a little bit of transient numbness. No weakness. No giving out. She did undergo x-rays of the hip, pelvis and lumbosacral spine. These were all normal except for some mild degeneration of the discs, very minimal. She notes that the Flexeril (a muscle relaxant), Diclofenac (non-steroidal anti-inflammatory) and the Vicodin (narcotic pain reliever) all

9

helped in combination but she ran out of those. . . . She has not gone for the physical therapy, which I definitely think would be helpful". Plaintiff had no other complaints besides the back pain. Dr. Schultz assessed acute myofascial strain and spasm with radicular symptoms. He continued her on Flexeril, Diclofenac, and Vicodin with no refills and recommended using heat alternating with ice. "Strongly recommend physical therapy. She will consider that. . . . Counseled to d/c [discontinue] tobacco."

The following week on April 11, 2002, plaintiff reported to Dr. Schultz that the Vicodin was not giving her much pain relief (Tr. at 103). He gave her a trial of Edflex (for pain/muscle spasm).

On April 16, 2002, plaintiff returned to see Dr. Schultz for a follow up on her low back pain (Tr. at 102). Plaintiff's weight was 142 pounds. Plaintiff complained that her back pain was exacerbated by movement, sitting or standing. "She's been tried on various anti-inflammatories and initially she said that the Vicodin (narcotic pain reliever) didn't help, but she did today state that she took two of them at a time and it did help. . . . No cough or shortness of breath."

Dr. Schultz performed an exam of plaintiff's back.

10

"Marked point tenderness of the paraspinal musculature of the inferior lumbar spine and sacrum and marked point tenderness over the SI [sacroiliac] joints. . . . Diminished flexion secondary to pain by 50% and lateral rotation by 30%. Straight leg raises positive bilaterally at 85 degrees." Dr. Schultz assessed bilateral sacroiliac joint strain, and he gave plaintiff an injection of Demerol (a narcotic analgesic used to treat moderate to severe pain) and Phenergan (an antihistamine). He prescribed Vicodin 5 mg #15 (narcotic pain reliever) one to two orally every four to six hours as needed for pain. He also gave her samples of Mobic (non-steroidal anti-inflammatory) and Zanaflex (muscle relaxant).

The following day, on April 17, 2002, plaintiff saw Diane Cornelison, D.O., a neurologist, who performed a nerve conduction study[1] (Tr. at 114-115, 122-123, 136-138). "She

---

[1] A nerve conduction study is one part of a comprehensive nerve and muscle diagnostic test. A nerve conduction study is typically ordered by a physician to evaluate for muscle or nerve damage as part of a medical workup. The examiner uses a computer, monitor, amplifier, loudspeaker, stimulator and high tech filters to monitor the functioning nerves and muscles of the body. The examiner places small electrodes on the skin over muscles being tested in the arms or legs. The examiner then uses a stimulator to deliver a very small electrical current to the skin near nerves being tested, causing the nerves to fire. The electrical signals produced by nerves and muscles are

works as a carpenter's assistant with her husband and does stooping, dragging, pushing, pulling, and hauling." Plaintiff reported that she was smoking a pack of cigarettes a day, occasionally drank alcohol, and was self employed working as a carpenter's assistant with her husband.

Dr. Cornelison performed an exam. No atrophy was noted, straight leg raising was positive on the left, plaintiff had paraspinous muscle tenderness of the lumbar spine with decreased range of motion.

Dr. Cornelison's impression was an abnormal study consistent with:

"1.    Left acute S1 radiculopathy[2].

2.    There is no electrical evidence of an isolated left peroneal or tibial neuropathy[3].

_____

picked up by the computer, and the information is interpreted by a physician specially trained in electrodiagnostic medicine. The stimulator only produces a very small shock that does not cause damage to the body. Many different motor and sensory nerves are typically evaluated.

[2]Radiculopathy refers to pain that is felt at the nerve end as a result of nerve compression that occurs at the nerve root in the spinal column. It is known as either cervical or lumbar radiculopathy depending upon where the nerve compression and the pain occur.

[3]Functional disturbances or pathological changes with the peroneal nerve, which originates in the sciatic nerve and supplies the nervous energy and stimulation to the calf and foot, or the tibial nerve in the lower leg.

3.    There is no electrical evidence of a left sciatic nerve pathology.

4.    There is no electrical evidence of a peripheral polyneuropathy[4] affecting the left lower extremity.

5.    There is no electrical evidence of a left lumbar sacral plexopathy [decreased movement or sensation]."

She noted that X-rays of the lumbar spine had been completed previously and were essentially unremarkable.  She gave plaintiff two trigger point injections, recommended she continue Arthrotec (non-steroidal anti-inflammatory) and Hydrocodone (narcotic pain reliever) on an as-needed basis, told her to continue Flexeril (a muscle relaxant), and also prescribed Zanaflex (muscle relaxant).

Her conclusions were:

1.    Left acute S1 radiculopathy[5].

2.    No evidence of a left peroneal or tibial neuropathy [peroneal neuropathy is also called "foot drop"; tibial neuropathy is disease of the tibial nerve].

_____

[4]A failure of the nerves that carry information to and from the brain and spinal cord.

[5]Radiculopathy refers to pain that is felt at the nerve end as a result of nerve compression that occurs at the nerve root in the spinal column.

3.   No evidence of a polyneuropathy effecting the left lower extremity [polyneuropathy means diseases of multiple peripheral nerves simultaneously].

Five days later, on April 22, 2002, plaintiff returned to see Dr. Schultz (Tr. at 101).  He refilled plaintiff's Vicodin 5 mg #10 (narcotic pain reliever) one to two orally every four to six hours as needed for pain and directed her to follow up with Dr. Cornelison as directed.  No refills until reevaluation.

On April 25, 2002, plaintiff returned to see Dr. Cornelison (Tr. at 135).  "While she says she is sleeping, she continues to have some spasm and is tolerating the Zanaflex without difficulty."  The injection of her left lower back for pain relief gave her "approximately 15-20% betterment, plaintiff is able to sleep without excruciating pain but still has difficulty walking."  Dr. Cornelison diagnosed lumbar sacral radiculopathy[6].  She continued plaintiff on the Zanaflex, prescribed Percocet (narcotic pain reliever) as needed, "hold the Lorcet" (narcotic pain reliever), continued plaintiff's Voltaren (non-steroidal

_____

[6]Radiculopathy refers to pain that is felt at the nerve end as a result of nerve compression that occurs at the nerve root in the spinal column.

anti-inflammatory), continued plaintiff with 5-pound weight limit, and recommended that plaintiff have an MRI.

On May 2, 2002, plaintiff saw Charles Stricker, M.D., who performed an MRI of plaintiff's lumbar spine (Tr. at 120-121, 133-134). His impression was: "There is mild degenerative lumbar spondylosis[7] without herniated lumbar disc or central vertebral canal stenosis[8]."

Plaintiff had a follow up with Dr. Cornelison on May 13, 2002 (Tr. at 131). Dr. Cornelison performed a physical exam. She noted that plaintiff's gait was cautious with increasing pain according to plaintiff. "I suspect some of her back pain is related to underlying female pathology, specifically ovarian cyst disease. We will proceed with ultrasound."

That same day plaintiff saw Dr. Carlton, who performed a pelvic ultrasound (Tr. at 119, 132). Dr. Carlton's impression was possible complex cyst in the center of the

_____

    [7]Spondylosis generally means changes in the vertebral joint characterized by increasing degeneration of the intervertebral disc with subsequent changes in the bones and soft tissues.

    [8]Canal narrowing which results in pain in the buttock, thigh, or leg.

right ovary which was small, complex cyst in the left ovary with greatest diameter of 3.2 cm.

On May 17, 2002, Dr. Cornelison performed a right L4-5 facet injection, left L4-5 facet injection, lumbosacral L5-S1 epidurogram[9], and lumbosacral L5-S1 epidural injections (Tr. at 109-110, 117-118, 128-130). "The patient sustained some immediate relief upon the completion of the injections."

On June 3, 2002, Dr. Cornelison wrote a letter to Dr. Schultz after seeing plaintiff (Tr. at 127).

> An EMG [referring to the nerve conduction study] was consistent with left S1 pathology. An MRI was consistent with disc desiccation[10] and facet

---

[9]An epidurogram may identify areas of scarring, bony narrowing, nerve and/or nerve root constriction, other compressive lesions, possible nerve inflammation, and degree of fluid flow (or lack thereof) in the epidural space.

[10]Vertebrae are bones that form an opening in which the spinal cord passes. These bones are stacked one on top of another. In between the vertebrae are flat, cushiony discs (known as intervertebral discs) that act as shock absorbers. The discs normally contain a certain amount of fluid. Disc desiccation is abnormal dryness of the discs. Disc desiccation is common in older people and it can occur in any area of the spine from top to bottom. As a result of this dryness and loss of fluid, the disc(s) degenerate (wear away) to a degree. Disc desiccation is the earliest visible sign of disc degeneration. Disc degeneration can range in severity from mild, moderate, to severe. Severe cases of disc degeneration can require surgery to fix the problem.

16

hypertrophy[11] at L4-5 and L5-S1. Spondylosis[12] was also appreciated at the L4-5 and L5-S1. X-rays of the lumbar spine would confirm the diagnosis. We had recommended conservative management. She had undergone sacroiliac joint injections with plus/minus relief. She continued medications.

I was concerned that part of her pain may be related to underlying female pathology. . . . An ultrasound was completed of the abdomen and is consistent with complex cysts of the ovaries bilaterally, somewhat more prominent on the left.

We have recommended OB/GYN evaluation and possible hysterectomy in order to help control the underlying abdominal and low back pain. . . While we are able to help the low back pain with facets, epidurals, physical therapy, and medications, we would be unable to assist with the visceral pain [internal organ pain] and its referred pain related to underlying ovarian pathology. She understands as such. She is willing to proceed with consultation.

(Tr. at 127).

On August 27, 2002, plaintiff returned to see Dr. Cornelison for a follow up (Tr. at 146). "She has been released from Dr. Hoffmeister and has undergone a

_____

[11]The facet joints are structures in the back of the spine about the same size as small knuckle joints. They help guide movement and keep the vertebrae oriented in the right direction. Wear and tear arthritis can cause the joints to become bigger, the same way hand joints become bigger in older people with arthritis. Injuries can also lead to instability which causes the joints to bear the brunt of more wear and tear. Facet hypertrophy in the low back can sometimes cause the exiting nerve root to become pinched in a condition known as lateral recess stenosis.

[12]Accumulation of new bone (calcium deposits) around the spinal vertebrae.

Case 3:04-cv-05067-REL   Document 17   Filed 08/16/05   Page 17 of 85

hysterectomy. As far as the abdominal pain is concerned, she is pain free at this time. She continues to complain of left lumbar radiculopathy[13] into the heel with numbness and tingling." Dr. Cornelison decided to proceed with epidurals. "She has undergone lumbar epidural at L5-S1 and bilateral facet blocks at L4-5 with excellent relief in May. Will proceed with epidural and start physical therapy. She will continue the Hydrocodone (narcotic pain reliever) no more than 3 times per day. Dr. Cornelison also prescribed Bextra (non-steroidal anti-inflammatory) and Zanaflex (muscle relaxant).

On September 12, 2002, plaintiff saw Dr. Schultz for a follow-up on her chronic back pain (Tr. at 196-198). Plaintiff said she was feeling depressed. Dr. Schultz assessed chronic back pain and depression. He prescribed Flexeril (a muscle relaxant), Zanaflex (muscle relaxant), Ultracet (used for short-term management of pain), Skelaxin (muscle relaxant), Topamax (used to control seizures and migraine headaches), and Lexapro (treats depression and general anxiety).

---

[13]Pain that is felt at the nerve end as a result of nerve compression that occurs at the nerve root in the spinal column.

On September 25, 2002, plaintiff returned to see Dr. Cornelison (Tr. at 145). Plaintiff reported that the epidural completed on September 12, 2002, did not give her any relief, but she had a headache 48 hours afterward. "Lisa's original root irritation was related to a radiculitis from female pathology and/or injury initially. This was per EMG. If she has had no relief with epidurals, I think it is less likely that there is a specific root pathology and concern for narcotic use at that point should be evaluated. As far as physical therapy is concerned, we have asked her to continue."

On November 18, 2002, plaintiff saw Curtis Evenson, M.D. (Tr. at 288-290). Social History: "She smokes about a pack a day. Drinks one pot of coffee. Drinks occasional alcohol. She is currently not working." Dr. Evenson performed a physical exam. The sacroiliac joints were palpated and relatively nontender. Her muscle tension did not appear to be greatly increased. She would flex forward but only slightly and complained of pain in the mid-back. Her hips and knees moved well. Dr. Evenson reviewed plaintiff's prior MRI scan. His assessment was: Chronic low back pain of unknown etiology. "Most likely culprit would probably be her degenerative disk at L3-4. . . . She

19

has some facet arthritis but certainly does not seem severe.
. . . The only thing I could specifically offer her would
be a repeat of her facet injections though I think this
would probably be low yield.  I have also talked to her that
there is probably a reasonable chance that this pain is due
to the degenerative disk but the only way that we could find
this out is undergoing diagnostic diskography[14].  I did not
feel that this was in her best interest at this time in that
if she did have a positive disk at this level, I won't have
any other specific options to offer her.  IDET[15] would be
considered but Medicaid will not pay for this.  The only
other option would be a surgical referral and I think it may
be difficult to find a surgeon that would probably fuse her
back, especially with her smoking history."

_____

[14]Discography involves the injection of contrast dye
into the center of a disc under x-ray control. It is
strictly a diagnostic procedure. Local anesthesia and
sedation is used during the procedure. Discography is used
to determine whether or not pain is coming from a disc, as
well as identifying abnormalities in the disc. Abnormalities
can include disc herniations, tears and fissures.

[15]Intradiscal Electrothermal Annuloplasty ("IDET") is a
fairly advanced procedure made possible by the development
of electrothermal catheters that allow for careful and
accurate temperature control. The procedure works by
cauterizing the nerve endings within the disc wall to help
block the pain signals.

On January 27, 2003, plaintiff saw Dr. Schultz for a follow up (Tr. at 191-194). He noted that plaintiff was recently diagnosed with depression and had started taking Lexapro. "She notes that taking Laxapro, she is now feeling much better, back to her normal self. She has not been tearful, crying, or feeling depressed."

His assessment was: 1. Depression improved, 2. Chronic back pain with radiculopathy, 3. Laryngitis, acute bronchitis.

On January 30, 2003, plaintiff saw Dr. Cornelison for a follow up after her evaluation at St. John's Pain Center (Tr. at 143, 195). "They did not believe they had anything further to offer her. They believed facet blocks would have low yield and did not recommend the facet blocks. They indicated that a surgical opinion would be reasonable, although I have only soft findings for surgical opinion evaluation. On the other hand, she continues to be symptomatic with radicular symptoms. While part of the pain was related to underlying female pathology and the catamenial sciatica[16] has dissipated, she does continue to

---

[16]Patients with endometriosis have nerve involvement producing radiating pain down their buttock and leg in association with their menstrual periods.

have discogenic pain.  I recommended discogram with IDET
procedure, which I think would probably give her relief from
the low back pain.  However, we are unable to obtain that
secondary to Medicaid guidelines.  An L3-4 and L4-5 disc
bulge with desiccated disc pathology may be indeed the
underlying culprit.  We will refer to physiatry for a second
opinion, as well as neurosurgery.  I suspect she is not a
surgical candidate.  However, I have little else to offer
her at this point but medications.  I am concerned about her
continued use of Percocet [narcotic pain reliever], and we
have limited her ability to use Percocet.  We have also sent
Dr. Evenson a letter in hopes that he would reconsider facet
blocks or discogram.  If we could get these diagnostic
procedures completed, and if the procedures do reveal the
need for IDET procedure, the patient is willing to cease
smoking and I would file a Medicaid Exception."

A week later, on February 7, 2003, plaintiff saw
Maureen McConnell, a physical therapist (Tr. at 224).  "Her
original pain complaints began after stooping and bending
for long periods of time, helping her husband fill in the
holes on the new floors at one of the hotels. . . .  She is
avoiding any lifting, bending forward, or carrying of
objects.  She can get in and out of bed and in and out of a

22

chair.  She does not indicate that she is using heat or ice
at home.  She is having some difficulty with bowel
movements, probably due to her medications.  She can lie in
the left side lying position with a pillow between her legs.
She sees herself as severely disabled due to this problem. .
. .  All positions and movements aggravate her pain with
lying down giving some ease.  The patient has disturbances
of sleep due to pain and limitations in her ability to
complete daily work and chore responsibilities.  She
regularly misses attending social activities because of this
problem, but does not require assistance with activities of
daily living."

In a letter to Dr. Weber on February 14, 2003, Ms.
McConnell stated that plaintiff had physical therapy
sessions after an injection into her left hip, and plaintiff
showed "marked improvement in left hip mobility".

On February 14, 2003, Chris Weber, M.D., wrote a letter
to Dr. Schultz (Tr. at 188-189).  He reviewed Dr.
Cornelison's notes, CT, myelogram, MRI, x-rays, and
performed a physical exam.  Dr. Weber concluded that
plaintiff has piriformis syndrome[17] based on different

_____

[17]Piriformis syndrome is a condition in which the
piriformis muscle irritates the sciatic nerve, causing pain

signals at L3 on the imaging and degenerative changes at L5-S1 without an impressive root impingement.

Dr. Weber recommended that Dr. Evenson "try provocative discography at L3 and L5-S1 in particular for concordance of pain symptoms. If positive, consider IDET." Dr. Weber recommended that plaintiff begin physical therapy with possible injection of the area and use an anti-inflammatory. "Dr. Cornelison was managing her on Percocet and seemed to disagree with the patient seeking disability. There has been a lack of follow-up at that point. Dr. Cornelison didn't see a problem with the narcotic and that could be conceivably continued if it provided greater relief or function. The process of disability complicates this."

On February 18, 2003, plaintiff saw Dr. Schultz (Tr. at 183-186). "Needs refill of Relafen (non-steroidal anti-inflammatory) which has been working fairly well for her. It certainly has not resolved her back pain, she continues to see Dr. Cornelison and Dr. Weber for that but it has

_____

in the buttocks and referring pain along the course of the sciatic nerve. This referred pain, called sciatica, often goes down the back of the thigh and/or into the lower back. Patients generally complain of pain deep in the buttocks, which is made worse by sitting, climbing stairs, or performing squats. The piriformis muscle assists in abducting and laterally rotating the thigh.

helped some." Plaintiff also complained of a cough. The notes reflect that plaintiff had a history of tobacco use.

Dr. Schultz's assessment was:

1.    Acute bronchitis with mild bronchospasm complicated by smoking. Prescribed Zithromax (antibiotic), Advair Discus (a steroid which relaxes muscles in the airways to improve breathing), and Codiclear DH for cough, "Discontinue tobacco."

2.    Chronic back pain, osteoarthritis. Prescribed Relafen (non-steroidal anti-inflammatory), follow up in 6 months.

3.    Discussed family history of heart disease, ordered blood tests, "Counseled at length, discontinue tobacco."

On March 6, 2003, plaintiff reported to Dr. Schultz that her pain medication was not working, her pain was an 8 out of 10 (Tr. at 181-182). He prescribed Mobic (non-steroidal anti-inflammatory), Edflex for pain/muscle spasm, and Lovastatin (reduces cholesterol).

On March 17, 2003, plaintiff saw Dr. Weber (Tr. at 180). "Lisa returns after injection and therapy for piriformis syndrome. She also reports a faith healing and has had complete relief of her leg symptoms. Her back symptoms persist, about 7/10, worse with activity and

25

motion.  She has not taken Percocet or any other drug except for some marijuana since January."

Dr. Weber performed a physical exam:  "Moves well about the room.  No limp or antalgia[18].  No reports of back pain."

Dr. Weber's impression was:

1.  Piriformis syndrome largely resolved.

2.  I believe she has L3-4 and/or L5-S1 disc generated back pain.

Plaintiff was given Percocet (narcotic pain reliever), a prescription for 60 to last one month, and told to refill with Dr. Schultz.  "I hope Dr. Evenson could get her in for IDET before her appointment with Dr. McQueary to help confirm or refute location of a generator for symptoms.  If no generator is defined, I would strongly argue against even seeing a surgeon."

On April 22, 2003, plaintiff saw Jack Gillispie, M.D., who is an associate of Dr. Schultz (Tr. at 175-177).  The medical records read as follows:

> Lisa comes to the office this afternoon saying that she
> has been taking Percocet prescribed by Dr. Weber in
> Branson and Dr. Weber told her that Dr. Schultz was
> going to continue to prescribe this pain medication for
> her.  This lady apparently has chronic low back pain

---

[18]A posture or gait assumed in order to avoid or lessen pain.

due to some degenerative disc disease. I have reviewed
Dr. Schultz's notes. There is a copy in the EMR of a
letter from Dr. Weber indicating that he gave this
medication and discussed chronic narcotic use with this
patient. Also, that he discussed this with Dr.
Schultz, although it does not appear that Dr. Schultz
has ever prescribed this type of medication for her.
This lady tells me that she has an appointment with Dr.
Fred McQuarrie [McQueary] in Springfield who is an
orthopedist for consideration of surgery, although Dr.
Weber's notes indicate that he does not feel that she
is a surgical candidate. After a long review of these
records with the patient today in the office and the
fact that the Percocet, 2 daily is not controlling her
pain, although she has made it last for the last month,
taking her last pill yesterday. She is crying in the
office today with pain. I have again had a long
discussion with her about chronic narcotics. The fact
that people become not only addicted but tolerant to
medication, the fact that it will require a visit to
the office on a monthly basis and the fact that there
is a high likelihood she will never get off of this
type medication, she wants to proceed. I have told her
that in my opinion, she probably should not be taking
short acting pain medication but needs to be taking
only long acting pain medication, therefore I have not
given her a refill on her Percocet as prescribed by Dr.
Weber. I have instead started her on MS-Contin
[Morphine Sulfate], 15 milligrams 1 every 12 hours. I
have given her a prescription for 60 pills. She knows
she needs to return physically to the office for
follow-up before she will get more prescriptions.

On May 2, 2003, plaintiff returned to see Dr. Schultz
(Tr. at 172-174). The notes reflect that plaintiff was not
experiencing pain and had not experienced pain in the last
two weeks. She was there for a follow up on dyslipidemia
(lipid abnormalities). She complained of feeling bloated.
"She has noted a little bit of shortness of breath but,

27

again, she does smoke."  His assessment:  "1. Dyslipidemia.
Will discontinue Lovastatin (reduces cholesterol), place her
on Pravachol (reduces cholesterol) 40 mg daily q h.s. [each
night at bedtime].  Low fat, low cholesterol diet.  Regular
aerobic exercise, weight loss.  2.  Elevated AST, ALT [liver
enzymes].  Since initiating Lovastatin or Mevacor,
discontinue the Lovastatin, place her on Pravachol.  Recheck
liver function tests today.  Check a hepatitis panel.
Strongly recommend abstaining from alcohol, minimize or
abstaining from Tylenol. . . .  3. Back pain.  Continue
medications as above,  Follow up with Dr. McQueary as above.
4.  Fatigue, edema. . . .  "Counseled to discontinue
tobacco."

On May 3, 2003, plaintiff returned to see Dr. Schultz
(Tr. at 169-171).  The notes reflect that plaintiff was not
experiencing pain and had not experienced pain in the last
two weeks.  She complained of abdominal bloating and some
nausea.  "She is working on quitting smoking but is still
smoking somewhat."  His assessment:  Dyspepsia[19], post-

_____

[19]Pain or an uncomfortable feeling in the upper middle
part of the stomach.

28

prandial nausea (nausea following a meal), sometimes emesis (vomiting). He prescribed Protonix (reduces stomach acid), "counseled discontinue tobacco."

A week later, on May 30, 2003, plaintiff returned to see Dr. Schultz (Tr. at 166-168). The notes reflect that plaintiff was not experiencing pain and had not experienced pain in the last two weeks. She came in for a refill on Morphine. Dr. Schultz's assessment: 1. Back pain with radiculopathy improved on morphine sulfate, once daily for 30 days, no refills. 2. Gastroesophageal reflux disease. 3. Dyslipidemia, "Pravachol 40 mg. q.h.s. [at bedtime], low fat, low cholesterol diet, regular aerobic exercise, weight loss."

On June 17, 2003, plaintiff saw Fred McQueary, M.D. (Tr. at 275-277). Dr. McQueary noted that plaintiff smoked 1 1/2 packs of cigarettes per day but "quit smoking about a month ago." He performed a physical exam and found moderate paravertebral spasms. He could not determine her range of motion because plaintiff "does not flex more than 10 or 15 degrees due to fear of pain." Dr. McQueary reviewed plaintiff's imaging studies: "MRI scan of the low back done at Skaggs on May 2, 2002, was reviewed. I see no signs of neurologic compression or significant disk bulging. There

29

is some mild L3-4 degenerative disk disease manifested primarily as disk desiccation without any significant narrowing. Her myelogram and post-myelogram CT scan were also done at Skaggs Hospital on September 30, 2002. I see no signs of any neurologic compression at any of these levels."

Dr. McQueary's impression was as follows: "Lisa has a complex pain description that sounds like it could be coming from the left sided lower lumbar radicular pain or from sacroiliac dysfunction or piriformis syndrome. Her physical examination suggests components of sacroiliac and piriformis problems rather than just straight forward discogenic pathology." He recommended repeating an MRI to see if there were any significant changes before discussing treatment options.

On June 20, 2003, plaintiff saw Dr. Gillispie for chronic low back pain, and he refilled her medications (Tr. at 164-165).

Plaintiff returned to see Dr. McQueary on June 26, 2003 (Tr. at 274). The MRI of the lumbar spine showed some mild L3-4 disk desiccation. "There are no signs of neurologic

30

compression anywhere. There are no signs of neoplasia[20]. .

. . [T]here are no signs of compression around the sciatic

nerve and no abnormalities around the piriformis muscle. . .

. I had an extensive discussion with Ms. Garrett and her

husband today. I frankly do not feel that there is a

problem here that would be amenable to surgical

intervention. I feel that mostly likely, the piriformis

syndrome is the source of her symptoms and this should be

addressed by a combination of injections and therapy. There

is also an outside chance that a portion of her symptoms,

perhaps even all of them, would be due to sacroiliac

dysfunction. At any rate, I feel that an aggressive

rehabilitation approach to this would be the most

appropriate for her. I have suggested that she return to

see Dr. Weber and have him continue with his treatments in

those directions."

On July 16, 2003, plaintiff returned to see Dr. Weber

(Tr. at 163). The MRI of her pelvis showed no specific

nerve compression. Plaintiff had positive straight leg

raise, sciatica, and inferior SI joint pain. Dr. Weber's

impression was left piriformis syndrome, recurrent; L3-L4,

---

[20]The pathologic process that results in the formation
and growth of a tumor.

31

L5-S1 disk disease, worse with bracing. He gave her an
injection of Kenalog (a steroid) and prescribed physical
therapy.

The following day, on July 17, 2003, plaintiff returned
to see Dr. Gillispie for back and left hip pain (Tr. at 160-
162). "Lisa comes in the office today requesting a new
prescription for pain medication. . . . She has been seeing
an orthopedic surgeon Dr. McQueary . . . [and] has also been
seeing Dr. Weber in Branson for this problem . . . but she's
been coming here for her pain medication. She was initially
being prescribed short acting narcotics by Dr. Weber and
others and I placed her on long-acting morphine. To my
knowledge, she is not taking any short acting pain
medication now. She says she's only taking 1 of the 15 mg
MS Contin [morphine sulfate] about noon daily because she
doesn't have too much pain at nighttime, is able to sleep.
But when she is up [on] her feet, it bothers her a lot and
in fact . . . 30 pills that she has received most recently
has been lasting her about a month. She plans on getting
off of this pain medication at some point in the near future
hopefully when her back problem has been more directly
treated by Dr. Weber. I think it is appropriate that Dr.
Weber know that she is taking the pain medications. I

32

discussed that with her and she tells me that she has been informing him that she is on this particular medication. I am going to send a copy of this note today to Dr. Weber. I have given her a prescription for MS Contin 15 mg 1 daily for pain #30 with no refills."

On July 21, 2003, plaintiff had her initial visit with physical therapist Maureen McConnell (Tr. at 218-220). Plaintiff, at the time a 42-year-old housewife, reported that sitting or bending aggravates her pain, lying down gives some ease, and she experiences disturbances of sleep due to pain. "She is on Morphine at this time, which she reports knocks out her pain." Plaintiff reported her pain was a 9 on a scale of 1 to 10. "Pain prevents her from lifting heavy weight off the floor, but she can manage them if they are conveniently positioned. . . . Pain prevents her from sitting for more than 1 hour." Ms. McConnell planned five to six visits, manual therapy, ultrasound, and exercise.

On July 25, 2003, plaintiff saw Dr. Schultz (Tr. at 157-159). Plaintiff complained of pain – "chest on fire" – said she had not experienced pain in the last two weeks. She described her pain as a 5. "She unfortunately does continue to smoke against medical advice and there is a

33

family history of chronic obstructive pulmonary disease."
Dr. Schultz assessed acute bronchitis with bronchospasm
complicated by tobacco abuse. "[A]gain counseled
discontinue tobacco". He prescribed Biaxin (antibiotic),
Prednisone (a steroid), Codiclear DH (narcotic pain reliever
and cough suppressant), Combivent (treats chronic
obstructive pulmonary disease). He encouraged plaintiff to
undergo pulmonary function testing to rule out chronic
obstructive pulmonary disease.

On August 4, 2003, plaintiff's physical therapist wrote
a letter to Dr. Weber (Tr. at 214[21]). The letter states
that plaintiff said she could lift heavy weights but it
gives her extra pain. She said she can sit in her favorite
chair as long as she likes, but pain prevents her from
standing for more than one hour.

On August 11, 2003, plaintiff returned to see Dr.
Gillispie (Tr. at 154-156). Plaintiff complained of lung
pain over last two weeks. Her medications included Lexapro
(treats depression), Flexeril (a muscle relaxant), Zyprexa
(treats bipolar disorder and schizophrenia), Ultracet (used

---

[21]The record, at page 214, states "continued on page
2"; however, I have been unable to find a page 2 for this
document anywhere in the record.

34

for short-term pain management), Pravachol (lowers
cholesterol), Protonix (reduces stomach acid), Combivent
(treats chronic obstructive pulmonary disease), Prednisone
(a steroid), and Septra (an antibiotic). She was
experiencing ongoing symptoms of cough, was asking for
prescription cough syrup. Dr. Gillispie took x-rays of
plaintiff's lungs. He prescribed Septra and increased her
dose of Prednisone for ten days. "I am not going to give
her any cough syrup today. The importance of quitting
smoking is discussed. She says she is trying."

On August 23, 2003, plaintiff saw Danny Bruce, a
physician's assistant (Tr. at 151-153). Plaintiff
complained of aching all over, fever and headache. She said
she was recently treated for bronchitis. Mr. Bruce
diagnosed flu, prescribed clear liquids for next 8 hours and
bed rest. He indicated her symptoms should be cleared up in
48 hours.

On September 10, 2003, plaintiff returned to see Mr.
Bruce (Tr. at 149-150). She complained of chronic back pain
rated as a 7. "She has responded very well to Ultracet.
This has gotten her off of morphine and [she] seems to have
taken a much better perspective about her illness. This has
helped with her depression, she is no longer having any

35

insomnia."

That same day, September 10, 2003, physical therapist Maureen McConnell wrote a letter to Dr. Weber (Tr. at 210). Plaintiff had reported that her pain medication gives her very little relief, she can lift only very light weight, she can sit for no more than one hour, she can walk for no more than one mile, she can stand as long as she wants but it gives her extra pain, she can sleep well with medications, her social life is normal but increases the degree of pain, and she can travel anywhere but it gives her extra pain. Ms. McConnell stated that she gave plaintiff an exercise routine.

On September 17, 2003, plaintiff returned to see Dr. Weber (Tr. at 148). "Lisa notes that with the physical therapy and routine regimen that she is getting quite a bit better." His impression was chronic piriformis syndrome, left trochanteric bursitis[22] mild, possible SI joint and L2-

---

[22]Trochanteric bursitis is a condition affecting the side of the hip. There are hundreds of bursae (plural for bursa) in the human body, especially in the joints of the shoulder, hip, knee, and ankle. These small sacs of fluid cushion the places where tendons, ligaments, and muscles move over bones. They help prevent or decrease friction between surfaces that move in opposite directions. When bursae become inflamed, there is pain whenever the affected part of the body is used.

36

5 degenerative disease.  He told her to repeat her initial therapy.

On September 26, 2003, plaintiff returned to see her physical therapist, Maureen McConnell (Tr. at 207). Although plaintiff had "much improved" left hip mobility, she stated she had increased low back pain with her exercises and showed poor ability to complete her extension exercises.  "The patient continues to report that she feels that her low back is restricting her ability to progress with her left hip.  She feels that since surgical intervention is not being considered at this time, she should be rated for SS disability."

On October 20, 2003, Dr. Weber completed a Medical Source Statement - Physical (Tr. at 140-141).  He found that plaintiff can frequently lift or carry 20 pounds, can occasionally lift or carry 25 pounds, can stand or walk continuously for one hour and for a total of four hours per day, can sit continuously for one hour and for a total of four hours per day.  Plaintiff has a 50 pound limit on pushing and pulling.  She can frequently reach, handle, finger, feel, see, speak, and hear; she can occasionally climb, balance, stoop, kneel, crouch, crawl, and reach. Plaintiff should avoid concentrated exposure to extreme

37

cold, extreme heat, weather, wetness, humidity, dust, fumes, vibration, hazards, and heights.  Dr. Weber was asked, "If patient suffers pain, is there need to lie down or recline to alleviate symptoms during an 8 hour work day?"  Dr. Weber checked, "unknown".  Dr. Weber was asked, "Does patient's pain, use of medication, or side effects of medication cause a decrease in concentration, persistence, or pace, or any other limitations?"  Dr. Weber checked, "yes" but then wrote, "Should be able to function with meds".

The next day, October 21, 2003, plaintiff returned to see Dr. Weber for a follow up (Tr. at 282).  She reported that after SI joint injection, she had no improvement.  Dr. Weber's impression was: "Chronic low back and buttock pain. Suspect this is of discal origin, probably L5-S1. Piriformis and SI joint issues are essentially ruled out." Plan:  Retry a more substantial brace on an as-needed basis, prescribed Percocet.  "Discussed the hazards of narcotic use, which might be worth pursuing only if it allows her to continue working.  Would ask her primary care doctor to continue this on a limited basis.  Exercise program.  She is also applying for disability.  I completed the forms for that with the best of my professional estimation."

On November 25, 2003, Dr. Schultz completed a Medical

38

Source Statement - Mental (Tr. at 201-202). Dr. Schultz found that plaintiff is not significantly limited in the following:

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

Dr. Schultz found that plaintiff is moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

39

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to respond appropriately to changes in the work setting

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

(Tr. at 201-201).

On that same day, November 25, 2003, Dr. Schultz completed a Medical Source Statement - Physical (Tr. at 204-205). Dr. Schultz found that plaintiff could frequently lift less than five pounds, occasionally lift less than five pounds, stand or walk for 15 minutes at a time and for a total of one hour per day, sit continuously for 30 minutes and for a total of one hour per day, and is limited in her ability to push or pull due to pack pain and leg pain. He

40

found that plaintiff could never stoop, kneel, or crawl; and that plaintiff could only occasionally climb, balance, crouch, reach, and handle. Plaintiff should avoid any exposure at all to hazards and heights, and should avoid concentrated exposure to extreme cold, extreme heat, weather, wetness, humidity, dust, fumes, and vibration. The form asks the doctor whether there is any need to lie down or recline to alleviate symptoms, and Dr. Schultz checked "yes" and wrote that plaintiff needs to lie down for 15 minutes every hour. Finally, Dr. Schultz checked "yes" when asked whether plaintiff's pain medications cause a decrease in concentration, persistence, or pace.

*C.* ***SUMMARY OF TESTIMONY***

During the December 9, 2003, hearing, plaintiff testified; and Cathy Hodgson, a vocational expert, testified at the request of the ALJ.

**1.  Plaintiff's testimony.**

At the time of the hearing, plaintiff was 43 years of age and is currently 44 (Tr. at 298). She has a tenth grade education, and never got a G.E.D. (Tr. at 298). Plaintiff was five feet five inches tall and weighed approximately 170 pounds (Tr. at 298-299).

41

Plaintiff experiences constant low back pain that goes
down into her left leg (Tr. at 300-301).  Plaintiff's pain
is constant, 100% of the time, and on average she rates it a
seven or an eight on a scale of one to ten (Tr. at 301).
When the pain is aggravated, it goes up to a ten (Tr. at
301).  Any movement, doing anything, or sitting for any
period of time aggravate her back pain (Tr. at 301).
Plaintiff estimated she could sit for an hour at the most
(Tr. at 301).  Plaintiff can stand for a maximum of 15
minutes (Tr. at 301-301).  She was asked how long she could
walk, but she did not answer (Tr. at 301-302).

The pain that travels down into plaintiff's left leg is
constant and as severe as her lower back pain (Tr. at 302).
Plaintiff experiences some weakness in her left leg, and her
hip sometimes goes out when she tries to stand up (Tr. at
302).  When asked if her pain causes problems with
balancing, plaintiff said, "Yes, it could." (Tr. at 302).
Plaintiff cannot bend or stoop (Tr. at 302-303).  Plaintiff
gets some relief from pain by lying down, lying on a heating
pad, and taking pain medication (Tr. at 303).  Although
plaintiff testified that she has no side effects from
medication when asked by the ALJ, she later was asked by her
attorney what type of side effects her medication causes,

42

and plaintiff said, "It just makes me a little lightheaded
and dizzy . . . [for] four to six hours." (Tr. at 303). The
dizziness makes it difficult for plaintiff to concentrate
(Tr. at 303). Plaintiff uses a heating pad for about 30
minutes each day (Tr. at 303). On her bad days, she lies in
bed all day on the heating pad (Tr. at 304). Plaintiff has
these bad days several times per week, and she rates her
pain a ten on those bad days (Tr. at 304). On good days,
plaintiff lies down three to four times each day for at
least an hour each time (Tr. at 303-304).

Everyday living brings on plaintiff's bad days (Tr. at
304). She has a difficult time making her bed, and she can
only do things around the house for about 15 minutes before
she has to take a break (Tr. at 304). It can take her all
day to do just a few things (Tr. at 304). Plaintiff can
only do about 40% of the things she used to do (Tr. at 305).

Plaintiff suffers from shortness of breath even when
walking to her mailbox, walking across a parking lot,
climbing steps (Tr. at 307, 308). She uses an inhaler four
times per day (Tr. at 307). When asked what brings on her
shortness of breath, plaintiff said, "Yeah, it could be due
to my smoking, but, you know, I think it's just I'm just out
of breath all the time now. And now that I have this back

43

brace, it's – I feel like everything's – " (Tr. at 307).
Plaintiff testified that she just got her back brace the day
of the hearing (Tr. at 307).

By the time of the hearing, plaintiff had cut down to
one pack of cigarettes per day from two packs per day (Tr.
at 308). Although she earlier said on her own that her
smoking may be causing her shortness of breath, she was
later asked if smoke aggravates her shortness of breath and
she said, "No." (Tr. at 308).

Plaintiff has a driver's license, but she does not
drive because sitting behind the wheel is too uncomfortable
(Tr. at 299-300). She has to take medication to help her
sleep because she cannot get comfortable when she is in bed
(Tr. at 305). With medication plaintiff sleeps about six to
seven hours each night (Tr. at 305-306). She is not drowsy
during the day, but she does suffer from depression (Tr. at
306). Plaintiff does not feel like going anywhere or
talking to anyone (Tr. at 306). Plaintiff suffers from
crying spells and irritability (Tr. at 306). Plaintiff's
memory is now impaired – she has to write things down (Tr.
at 307). She has difficulties keeping her mind focused and
concentrating (Tr. at 307). Plaintiff believes these
symptoms are a result of pain, depression, and side effects

44

of medication (Tr. at 307).

Plaintiff has not worked since her alleged onset date, April 1, 2002 (Tr. at 300). She was supposed to go back to work at a resort but she was unable because she could not walk (Tr. at 300). Plaintiff testified that she has no side effects from medication, although she believes the steroid shots she received in the past made her gain weight (Tr. at 299-300). She later testified that side effects from medication are partially responsible for her lack of concentration (Tr. at 307).

**2.   Vocational expert testimony.**

Vocational expert Cathy Hodgson testified at the request of the Administrative Law Judge. Ms. Hodgson asked plaintiff several questions about her previous work experience, including the length of time she worked a job in 1995, the length of time she worked another job in 1994, the amount of weight she lifted while working as a truck driver from 1989 until 1991, and her duties and length of employment at a turkey plant in 1989 (Tr. at 310-311). Plaintiff had no trouble remembering the answers to any of those questions.

The ALJ's first hypothetical assumed an individual with plaintiff's age, education, and prior work history who could

stand and walk for four hours; sit for four or more hours; but needs to alternate standing and sitting every 45 minutes to one hour; could lift up to 20 pounds and carry ten pounds frequently; can occasionally bend, stoop, crawl, or crouch; must do work that would not involve exposure to extreme vibration, significant unprotected heights, dangerous unguarded moving machinery, or commercial driving; should avoid exposure to noxious fumes, dust, smoke, or lint; must be able to use an inhaler as needed and would allow the use of a back brace; and the work could involve no more than simple, repetitive, one- to three-step instructions (Tr. at 312-313, 315-316). The vocational expert testified that such a person could not perform plaintiff's past relevant work (Tr. at 314). The person could not perform light work because of the standing limitation of only four hours (Tr. at 314). Light work requires six hours of standing (Tr. at 314). The person could, however, perform a wide range of sedentary unskilled work with a sit/stand option (Tr. at 314). For example, the person could be a table worker in production with 32,000 jobs nationally and more than 650 regionally (Tr. at 314). The person could also be a food and beverage order clerk, with 51,000 such jobs in the nation and 1,200 in the region (Tr. at 315).

46

Plaintiff's attorney then added to the ALJ's hypothetical the restrictions set out by Dr. Shultz in the Medical Source Statement - Mental dated November 25, 2003 (Tr. at 201-202, 316). The vocational expert testified that a person with those limitations would not be able to work (Tr. at 316). The attorney then modified the first hypothetical to include the conditions that the person could never bend or stoop (Tr. at 316). The vocational expert testified that the hypothetical person could not work (Tr. at 316). Next the attorney added to the first hypothetical the condition that the person lie down three or four times a day for a half hour each time (Tr. at 316). The vocational expert testified that such a person could not work (Tr. at 316). Next the attorney modified the first hypothetical to include the condition that the person was only at 40 percent of speed of the average worker (Tr. at 316-317). The vocational expert could not really give an answer to that hypothetical because she did not know what "average" would mean (Tr. at 317). Finally, the attorney modified the first hypothetical to include two to three missed days each month due to a back condition (Tr. at 317). The vocational expert testified that missing that much work would preclude employment (Tr. at 317).

47

## V.  FINDINGS OF THE ALJ

Administrative Law Judge Linda Carter issued her
opinion on March 26, 2004 (Tr. at 13-25).

Step One.  The ALJ found that plaintiff has not worked
since alleging disability on May 7, 2002 (Tr. at 14).

Step Two.  The ALJ found that plaintiff suffers from
lumbar spine degenerative joint disease and bronchitis,
which are severe impairments (Tr. at 14).  Plaintiff alleged
disability due to an affective disorder; however, the ALJ
found no medical evidence to substantial any significant
limitations associated with an affective disorder (Tr. at
15).  The ALJ pointed out that plaintiff was diagnosed with
depression by Dr. Schultz on December 12, 2002.  She was
provided with medication, but was not referred for
psychiatric and/or psychological counseling or therapy.  Dr.
Schultz noted that plaintiff's depression was improved on
February 13, 2003; and on May 2, 2003, plaintiff reported
that she was feeling fine with no depression or anxiety (Tr.
at 15).

Step Three.  The ALJ found that plaintiff's impairments
do not meet or equal a listed impairment and noted that
plaintiff's representative did not contend that plaintiff's
impairments meet or equal any Listing (Tr. at 16).

48

Step Four.  The ALJ analyzed plaintiff's credibility and found her allegations to be exaggerated (Tr. at 19-21). She determined that plaintiff maintains the residual functional capacity to lift and carry 20 pounds occasionally and ten pounds frequently; stand or walk at least four hours in an eight-hour workday; sit for four hours in an eight-hour workday with a sit/stand option every 45 to 60 minutes; may occasionally stoop, kneel, crouch, crawl, or bend; should have no significant exposure to unprotected heights, potentially dangerous unguarded moving machinery, or commercial driving; should work in a climate-controlled work place reasonably free of environmental irritants; should avoid exposure to extreme vibration; must have access to an inhaler and wear a back brace as needed; and is limited to simple, repetitive work (Tr. at 21).  The ALJ then found that plaintiff cannot return to her past relevant work (Tr. at 23).

Step Five.  The ALJ found that plaintiff has the ability to perform other jobs in significant numbers in the national and regional economies, such as sedentary, unskilled work as a table worker with 650 jobs in Missouri and 32,000 in the country, or sedentary, unskilled work as a food and beverage order clerk with more than 1,200 jobs in

49

Missouri and 51,000 in the country (Tr. at 23).

Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

## VI. *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. *CONSIDERATION OF RELEVANT FACTORS*

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

50

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The claimant's self-reported activities of daily living are inconsistent with such allegations of totally debilitating symptomatology. The claimant testified at the hearing that she does some housework, with frequent rest periods. The claimant reported in the Claimant Questionnaire that she is able to prepare and cook simple meals, watches television and reads, drives to

51

medical appointments, and attends one hour church services.

Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

The claimant's responses while testifying were evasive or vague at times, and left the impression that the claimant may have been less than entirely candid. The record includes evidence strongly suggesting that the claimant has exaggerated symptoms and limitations.

She testified that her back pain is worse when sitting; yet, the undersigned observed the claimant betrayed no evidence of pain or discomfort while testifying at the hearing. While the hearing was short-lived and cannot be considered a conclusive indicator of the claimant's overall level of pain on a day-to-day basis, the apparent lack of discomfort during the hearing is given some slight weight in reaching the conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity.

The undersigned is skeptical concerning the claimant's need for a back brace. She has been treated for several years by various specialists and none of them ever indicated any need for a brace. Yet, on the day of the hearing, the claimant suddenly has need for a back brace. Additionally, the undersigned found no record of any physician prescribing a back brace for the claimant. Additionally, Dr. Weber noted on July 16, 2003, that the claimant's condition was "worse with

52

bracing".

The claimant also testified she experiences shortness of breath walking to the mailbox and uses an inhaler four times per day; yet, there is no medical evidence to support this level of severity. The only time the claimant complained of, or was treated for, shortness of breath was when she had bronchitis.

The claimant told Dr. Weber on March 17, 2003, that she had a complete relief of leg symptoms and he noted that she moved well about the room with no limp or antalgia, and no reports of back pain. However, she told Dr. McQueary on June 17, 2003, that her pain was 50% in the left leg and Dr. McQueary noted her gait was slowed with a forward flexed posture.

The claimant reported in the <u>Claimant Questionnaire</u> that she was "not supposed to lift anything;" yet, Dr. Weber indicates she could lift up to 25 pounds. . . .

. . . The claimant alleges that she is disabled due to bronchitis; yet, the record shows that the claimant still smoked, despite her pulmonary condition and being counseled by a treating physician to discontinue tobacco. Smoking cigarettes is inconsistent with claimant's complaints of shortness of breath and the inability to work.

The office visit notes reflect numerous occasions on which the claimant did not specify any particular complaint about her back pain, which contrasts with the current claim of ongoing, disabling symptoms since the alleged onset date. In fact, on several visits the claimant indicated she was not in pain, and had not been for two weeks. . . .

. . . The record is devoid of any evidence showing a significant degree of muscle atrophy, paravertebral muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance, or reduced range of motion of the spine or joints, an indication that claimant continues to move about on a fairly regular basis. . . .

Another factor influencing the conclusions reached in this decision is the claimant's generally unpersuasive appearance and demeanor while testifying at the hearing. It is emphasized that this observation is only one among many being relied on in reaching a conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity.

(Tr. at 19-21).

## 1. *PRIOR WORK RECORD*

Plaintiff's work record reflects that plaintiff worked only sporadically and earned very little over her lifetime. Her highest annual earnings occurred in 1990 when she made $9,166.62. Her average annual earnings for the 25 years after she entered the work force is $1,915.37. This factor supports the ALJ's credibility determination as plaintiff's lack of employment is not likely due to her disability.

## 2. *DAILY ACTIVITIES*

The ALJ discussed this factor at length in her opinion, and I find that the evidence of plaintiff's daily activities supports the ALJ's credibility determination.

In plaintiff's Claimant Questionnaire completed on June 2, 2002, she reported that she cannot clean her house, cook, or do dishes. Eight months later, on February 7, 2003, plaintiff told her physical therapist that she can get in and out of bed or a chair and needs no assistance with

54

activities of daily living, but she is unable to complete daily work and chore responsibilities and she regularly misses attending social activities. Plaintiff testified that she has difficulty making her bed and she can only do things around the house for 15 minutes at a time. She can barely walk to her mail box or across a parking lot due to shortness of breath.

As the ALJ pointed out, plaintiff never complained of such limiting symptoms to any of her doctors. Even if she had, it is clear that those symptoms, if credible, are not a result of her impairments. Plaintiff's doctors repeatedly told her to stop smoking and to engage in regular aerobic exercise. Therefore, rather than restricting plaintiff's daily activities, her doctors encouraged her to become more active.

**3. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS***

Plaintiff first complained of feeling depressed on September 12, 2002. Dr. Schultz diagnosed depression without anything to support that diagnosis other than plaintiff's allegation. By January 2003, plaintiff reported that she was back to her normal self, not feeling tearful, crying, or depressed. By September 2003, plaintiff continued to have no symptoms of depression and was sleeping

55

fine.  There is no other mention of depression in the record.

On March 17, 2003, Dr. Weber noted that plaintiff was moving well about the room with no limp or antalgia.  She had no reports of back pain.  He found her piriformis syndrome "largely resolved."

On May 2, 2003, plaintiff told Dr. Schultz she was experiencing no pain and had not experienced pain in the last two weeks.  On her next visit to Dr. Schultz she reported the same thing -- experiencing no pain and had not experienced pain for the past two weeks.  On May 30, 2003, plaintiff told Dr. Schultz she was experiencing no pain and had not experienced pain in the last two weeks.  On July 25, 2005, plaintiff told Dr. Schultz she was experiencing no pain and had not experienced pain in the past two weeks.

Although plaintiff testified that her hip sometimes goes out, the only mention of "giving out" in the entire medical record was from April 4, 2002, when plaintiff told Dr. Schultz that she has no problem with her hip giving out.

As the ALJ pointed out, the record shows that the duration, frequency, and intensity of plaintiff's symptoms were exaggerated in her testimony.  Plaintiff testified she experiences severe pain all the time; however, the record

56

does not support that allegation.  Plaintiff also alleges
she is disabled in part due to depression; however, again
the record does not support such an allegation.

**4.   *PRECIPITATING AND AGGRAVATING FACTORS***

In February 2003, plaintiff told her physical therapist
that all positions and movements aggravate her pain.  In
March 2003, she told Dr. Weber that her back pain was worse
with activity and motion.  In June 2003, plaintiff told Dr.
Gillispie that when she is up on her feet a lot, she has
pain.  In July 2003, she told her physical therapist that
sitting or bending aggravates her pain and that she can only
sit for one hour at a time due to pain.  Four days later,
plaintiff told Dr. Schultz she was not experiencing any pain
and had experienced no pain in the last two weeks.  Ten days
after that, plaintiff's physical therapist told Dr. Weber
that plaintiff had said she could lift heavy weights and
could sit in her favorite chair for as long as she likes.  A
month later, plaintiff was back to telling her physical
therapist that she could only lift very little weight and
could sit for no more than one hour.

Plaintiff's allegations are internally inconsistent,
and her allegations of severe pain caused by movement,
sitting, or standing are inconsistent with the medical

evidence.  Plaintiff's x-rays of her hip, pelvis and lumbosacral spine were all normal.  Dr. Cornelison recommended conservative management of plaintiff's pain and disagreed with her seeking disability.  Dr. McQueary recommended rehabilitation for plaintiff.  Plaintiff's doctors have instructed her for several years to participate in physical therapy and to get regular aerobic exercise.

Because of the lack of consistency in plaintiff's own allegations as well as the inconsistency between plaintiff's allegations and the record, I find that this factor supports the ALJ's credibility analysis.

## 5.  *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

On April 4, 2002 – three days after plaintiff's alleged onset date – she told Dr. Schultz that the Flexeril, Diclofenac, and Vicodin all helped in combination.  At the end of that month, plaintiff told Dr. Cornelison that she was tolerating the Zanaflex without difficulty.  By January 2003, plaintiff told Dr. Schultz that her Lexapro made her feel like her "normal self" and she was no longer depressed. On February 14, 2003, plaintiff's physical therapist noted that plaintiff showed marked improvement in left hip mobility.  On February 18, 2003, Dr. Schultz noted that Relafen had been working fairly well for plaintiff.

58

In the spring and summer of 2003 on four different occasions, plaintiff told Dr. Schultz that she was not experiencing pain and had not experienced pain for the past two weeks. In July 2003, plaintiff reported that she did not have much pain at nighttime and was able to sleep. She told her physical therapist in July 2003 that the Morphine "knocks out her pain". In September 2003, physician's assistance Danny Bruce noted that plaintiff had responded very well to Ultracet and had been able to stop taking Morphine. She also continued to experience no symptoms of depression. On September 17, 2003, Dr. Weber noted that plaintiff was getting "quite a bit better" as a result of her physical therapy.

The only side effect of medication noted in the record is constipation. Plaintiff testified during the hearing that she has no side effects. Later when asked by her attorney about side effects, plaintiff testified that her medication makes her lightheaded and dizzy for four to six hours, and that the dizziness makes it difficult for plaintiff to concentrate. This allegation is completely unsupported by the record, and it is contradicted by plaintiff's own testimony in response to questioning by the ALJ. I also note that plaintiff had no trouble remembering

answers to any questions asked at the hearing, including questions about her past work experience, the length of time she worked at a job, the amount of weight she lifted while working as a truck driver from 1989 until 1991, her duties at certain jobs, etc.

The substantial evidence in the record establishes that plaintiff's medication worked fairly well and she suffered no significant side effects. This factor supports the ALJ's credibility determination.

## 6. *FUNCTIONAL RESTRICTIONS*

There are relatively few restrictions by plaintiff's doctors that appear in the record. On March 27, 2002, Dr. Shultz told plaintiff to alternate heat and ice, and he wrote, "Relative rest." The following month, Dr. Cornelison gave plaintiff a five-pound limit on lifting. This was before plaintiff's abdominal pain was resolved through surgery. On July 16, 2003, Dr. Weber noted that plaintiff's symptoms were worse with bracing; however, on October 21, 2003, he recommended that plaintiff retry a more substantial brace on an as-needed basis. Plaintiff did not obtain a brace until the day of the administrative hearing.

On the other hand, there are numerous instances in the record of plaintiff's doctors prescribing exercise. Twice

60

in 2003, Dr. Schultz prescribed regular aerobic exercise. On July 21, 2003, plaintiff's physical therapist recommended she exercise. In September 2003, plaintiff was prescribed an exercise routine. On October 21, 2003, Dr. Weber recommended an exercise program.

Plaintiff has been internally inconsistent in her allegations of functional restrictions. On April 16, 2002, plaintiff told Dr. Schultz that sitting causes pain. On June 6, 2002, in her claimant questionnaire, she claimed that she can sit to ride to church, during the one-hour service, and then to ride back home. She also reported in that document that sitting causes pain. On July 21, 2003, she told her physical therapist that sitting causes pain and she can only sit for one hour. However, on August 4, 2003, plaintiff reported that she can sit as long as she likes. On September 10, 2003, she said she could sit for one hour and could "travel anywhere". At the administrative hearing on December 9, 2003, she testified that she could sit for one hour but could not drive because she was unable to sit, which seems to contradict her claim from a few months earlier that she could travel anywhere.

Plaintiff told Dr. Schultz that standing causes pain, but she told her physical therapist that she could stand as

61

long as she likes. On July 21, 2003, plaintiff said she could lift very heavy weights, but on September 10, 2003, she said she could only lift very light weights. There were no lifting restrictions placed on plaintiff by any doctor during that time.

On September 10, 2003, plaintiff told her physical therapist that she can walk a mile, but a few months later at the administrative hearing, she testified that she cannot walk.

Due to plaintiff's own inconsistencies and the lack of support in the record for her alleged functional restrictions, I find that this factor supports the ALJ's credibility analysis.

**B.    *CREDIBILITY CONCLUSION***

Aside from all of the factors described above, I note also that plaintiff has been noncompliant and her noncompliance has exacerbated her symptoms. In her claimant questionnaire, plaintiff reported that she does not always take her medication as prescribed because she cannot always afford her medication. Yet, through the years plaintiff has continued to smoke at least a pack of cigarettes per day, she has consumed alcohol, and she has used marijuana, choosing to spend her money on cigarettes, alcohol, and

62

drugs rather than her prescribed medication.  On March 27,
2002, Dr. Schultz noted that plaintiff continued to smoke
against medical advice.  On April 4, 2002, Dr. Schultz noted
that plaintiff had not gone for physical therapy as
directed.  He also counseled her on the importance of
discontinuing smoking.  On April 17, 2002, Dr. Cornelison
noted that plaintiff was smoking a pack of cigarettes a day
and occasionally drank alcohol.  On November 18, 2002, Dr.
Evenson noted that plaintiff was smoking a pack of
cigarettes per day, drank a pot of coffee per day, and
continued to use alcohol.  He also noted that it would be
difficult to find a surgeon who would fuse plaintiff's back
due to her smoking history.  On February 18, 2003, Dr.
Schultz noted that plaintiff continued to smoke and he told
her to stop.  In March 2003, Dr. Weber noted that plaintiff
had not taken any prescription medications over the past few
months but had used marijuana.  On May 2, 2003, Dr. Schultz
noted that plaintiff continued to smoke.  He strongly
recommended she abstain from alcohol and counseled her to
discontinue smoking.  On May 3, 2003, plaintiff told Dr.
Schultz she was trying to quit smoking but was still
smoking.  He again told her to quit.  On July 25, 2003, Dr.
Schultz noted that plaintiff continued to smoke against

medical advice despite having a family history of chronic obstructive pulmonary disease and suffering from bronchitis complicated by tobacco abuse. He again told her to quit smoking. On August 11, 2003, plaintiff tried to get a narcotic cough medicine from Dr. Gillispie who refused to give her that prescription and told her to stop smoking since she was making her cough worse.

When an impairment can be controlled by treatment or medication, it cannot be considered disabling. Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995); Stout v. Shalala, 988 F.2d 853, 854 (8th Cir. 1993); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989). Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. Roth v. Shalala, 45 F.3d at 282. Plaintiff has made her bronchitis problems worse with her continued smoking, and her smoking has cut off any surgical option she may have for her back problems. Despite being told that and being counseled for years to stop smoking, the record indicates that plaintiff continued.

For all of the reasons discussed above, I find that the substantial evidence in the record supports the ALJ's finding that plaintiff's allegations are not entirely

64

credible.  Plaintiff's motion for summary judgment on this basis will be denied.

## VII. OPINION OF TREATING PHYSICIANS

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician:  (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor.  20 C.F.R. § 404.1527(d)(2) - (5).

The two residual functional capacity assessments in the record are those by Dr. Weber and Dr. Schultz.  With regard to the above-listed factors, there is no question that plaintiff had an ongoing relationship with Dr. Schultz.  The

65

real factors at issue here are the supportability by medical signs and laboratory findings and the consistency of the opinion with the record as a whole.

The ALJ gave Dr. Schultz's November 25, 2003, Medical Source Statement - Physical less weight than the Medical Source Statement - Physical prepared by Dr. Weber on October 20, 2003 (Tr. at 22). The ALJ had this to say about the two opinions:

> The medical source statements-physical of Drs. Schultz and Weber conflict. However, the undersigned notes that Dr. Schultz is an internist, while Dr. Weber is a specialist in Physical Medicine and Rehabilitation. Additionally, Dr. Schultz completed the medical source statement on November [25,] 2003, four months after his last documented visit with the claimant on July 25, 2003, and his assertion that the claimant is able to sit/stand/walk combined only two hours in an eight-hour day is too extreme to be useful and inconsistent with the record as a whole. Finally, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. Accordingly, the undersigned affords much greater weight to the opinion of the specialist in this case, which is also better supported by the other evidence of record.

(Tr. at 22).

66

Although the ALJ did not specifically outline the inconsistencies between Dr. Schultz's Medical Source Statement and the record, they are certainly there and the ALJ explicitly relied on those inconsistencies to discount Dr. Schultz's opinion.

Dr. Schultz's findings, according to his Medical Source Statement, are as follows:

| | |
|---|---|
| Frequently lift | Less than 5 pounds |
| Occasionally lift | Less than 5 pounds |
| Stand | 15 minutes at a time<br>1 hour per day |
| Walk | 15 minutes at a time<br>1 hour per day |
| Sit | 30 minutes at a time<br>1 hour per day |
| Push/Pull | Limited due to back & leg pain |
| Stoop | Never |
| Kneel | Never |
| Crawl | Never |
| Bend | No limitation listed |
| Climb | Occasionally |
| Balance | Occasionally |
| Crouch | Occasionally |
| Reach | Occasionally |
| Handle | Occasionally |
| Need to lie down | 15 minutes every hour |

Case 3:04-cv-05067-REL   Document 17   Filed 08/16/05   Page 67 of 85

| Pain Medications | Cause decrease in concentration, persistence, and pace |
|---|---|

Below is a chart showing plaintiff's Residual Functional Capacity as determined by the ALJ:

| Frequently lift | 10 pounds |
|---|---|
| Occasionally lift | 20 pounds |
| Stand | 4 hours per day (sit/stand option every 45 to 60 minutes) |
| Walk | 4 hours per day |
| Sit | 4 hours per day (sit/stand option every 45 to 60 minutes) |
| Push/Pull | No limit |
| Stoop | Occasionally |
| Kneel | Occasionally |
| Crawl | Occasionally |
| Bend | Occasionally |
| Climb | No limitation |
| Balance | No limitation |
| Crouch | Occasionally |
| Reach | No limitation |
| Handle | No limitation |
| Need to lie down | None |
| Pain Medications | No side effects |

Comparing the above charts to the requirements of the jobs plaintiff could do, according to the vocational expert, indicates that several of the above factors are irrelevant.

68

The factors at issue here are the ability to lift, stand, walk, sit, and stoop, and the need to lie down. None of the other factors are relevant; therefore, I will limit my discussion to those relevant factors.

***Lift***

Dr. Schultz found on November 25, 2003, that plaintiff can occasionally lift less than five pounds and can frequently lift less than five pounds. The ALJ found that plaintiff can occasionally lift 20 pounds and frequently lift ten pounds.

Plaintiff's own allegations regarding her ability to lift are inconsistent with Dr. Schultz's findings. On July 21, 2003 -- four days before plaintiff's last documented visit with Dr. Schultz -- plaintiff told her physical therapist that she could lift heavy weights off the floor if they were conveniently positioned. On August 4, 2003 -- ten days after plaintiff's last visit with Dr. Schultz -- plaintiff said she could lift heavy weights. This means that at the very time Dr. Schultz was examining plaintiff for the last time before completing his Medical Source Statement, plaintiff, according to her own allegations, was able to lift heavy weights.

No doctor has ever placed a lifting restriction on

69

plaintiff except Dr. Cornelison. Dr. Cornelison advised plaintiff to lift no more than five pounds on April 25, 2002. At that time, Dr. Cornelison suspected that plaintiff's back pain was related to ovarian cyst disease. By August 27, 2003, plaintiff had undergone a hysterectomy and her abdominal pain was gone. Dr. Cornelison did not impose any lifting restriction after plaintiff's hysterectomy. No other doctor has ever placed a lifting restriction on plaintiff, notably Dr. Schultz. None of Dr. Schultz's records indicate that plaintiff should limit her lifting.

Finally, Dr. Weber found that plaintiff could lift 20 pounds frequently or 25 pounds occasionally. Dr. Weber is a specialist and is one of plaintiff's treating physicians.

Therefore, based on the entire record, I find that the ALJ correctly discounted Dr. Schultz's opinion regarding plaintiff's ability to lift. The opinion is not consistent with plaintiff's own allegations, it is not consistent with Dr. Schultz's own records, and it is not consistent with the other substantial evidence in the record.

### *Stand*

Dr. Schultz found on November 25, 2003, that plaintiff can stand for 15 minutes at a time and for about one hour

70

total per day.  The ALJ found that plaintiff can stand for four hours per day with a sit/stand option every 45 to 60 minutes.

Once again, Dr. Schultz's opinion contradicts even plaintiff's own allegations to other medical personnel. Plaintiff told her physical therapist in August 2003 that she could stand for an hour.  In September 2003, plaintiff told her physical therapist that she could stand as long as she wants.  The only mention in Dr. Schultz's records regarding plaintiff's standing is from April 16, 2002 -- more than 19 months before he completed the Medical Source Statement -- that plaintiff's pain is exacerbated by "movement, sitting, or standing."  There is no indication as to how long plaintiff was able to stand at a time or throughout the day, only that it exacerbated her pain.  Dr. Schultz never gave plaintiff any standing restrictions during the entire time he treated her.

Additionally, Dr. Weber, another of plaintiff's treating physicians, found that plaintiff could stand for an hour at a time and for a total of four hours per day.

Based on the above, I find that the ALJ correctly discounted Dr. Schultz's opinion with regard to plaintiff's ability to stand. Dr. Schultz's opinion is inconsistent with

plaintiff's allegations, it is inconsistent with his own treatment of plaintiff, and it is inconsistent with the findings of Dr. Weber. I also note that no doctor ever imposed any standing restrictions, which is inconsistent with Dr. Schultz's finding that plaintiff could stand for no more than 15 minutes at time and for an hour per day.

### *Walk*

Dr. Schultz found that plaintiff could walk for 15 minutes at a time and for a total of one hour per day. The ALJ found that plaintiff could walk for a total of four hours per day. Dr. Weber found in his Medical Source Statement that plaintiff could walk for a total of four hours per day.

There is very little in the record with regard to plaintiff's ability to walk. In fact, during the administrative hearing plaintiff was asked how long she could walk and she never answered that question. On April 25, 2002, plaintiff told Dr. Cornelison that she had difficulty walking due to pain. This again was when plaintiff was suffering from ovarian cyst disease. After her hysterectomy a few months later, her abdominal pain was gone. The only other mention of a limited ability to walk was in September 2003 when plaintiff told her physical

72

therapist that she could walk a mile.  It is highly unlikely
plaintiff was walking this mile in 15 minutes -- 4 miles per
hour is a very quick pace for a walk, especially for someone
suffering from back pain.  Therefore, plaintiff's ability to
walk a mile establishes that Dr. Shultz's walking limitation
of only 15 minutes at a time is contradicted by the
evidence.  Again, no doctor ever placed a walking
restriction on plaintiff.  The lack of any restrictions,
especially by Dr. Schultz, along with plaintiff's admitted
ability to walk a mile, support the ALJ's decision to
discredit Dr. Schultz's opinion with regard to plaintiff's
ability to walk.

### *Sit*

Dr. Schultz found that plaintiff can sit for 30 minutes
at a time and for a total of one hour per day.  The ALJ
found that plaintiff can sit for a total of four hours per
day with a sit/stand option every 45 to 60 minutes.  Dr.
Weber found that plaintiff can sit for an hour at a time and
for a total of four hours per day.

The evidence in the record is again varied.  On April
16, 2002, plaintiff reported that her pain is exacerbated by
sitting.  This is the only mention of sitting problems in
Dr. Schultz's medical records.  On July 21, 2003, plaintiff

told her physical therapist she could sit for an hour. On August 4, 2003, plaintiff said she could sit in her favorite chair as long as she likes. On September 10, 2003, plaintiff said she could sit for an hour. She told her physical therapist that she could "travel anywhere". In her claimant questionnaire, plaintiff reported that she rides to church with her husband and she sits through the service which is an hour long. With the ride to and from church combined with the services, plaintiff is clearly able to sit for longer than 30 minutes at a time and for longer than an hour per day. In fact, plaintiff testified at the administrative hearing that she could sit for an hour, and the ALJ noted that plaintiff was able to sit through the entire administrative hearing without appearing to be in any pain.

No doctor has ever placed any sitting restrictions on plaintiff. Even plaintiff's own allegations are not as restrictive as the findings of Dr. Schultz in his Medical Source Statement. Indeed, Dr. Schultz's own medical records do not support his finding as plaintiff only once complained to him of pain while sitting and that was more than 19 months before he completed the Medical Source Statement.

Based on all of the above, I find that the ALJ properly

74

discounted Dr. Schultz's opinion with regard to plaintiff's ability to sit.

### *Stoop*

Dr. Schultz found that plaintiff could never stoop. The ALJ found that plaintiff could occasionally stoop. Dr. Weber found that plaintiff could occasionally stoop.

The record establishes that on April 17, 2002, plaintiff told Dr. Cornelison that she was "stooping, dragging, pushing, and pulling". On February 7, 2003, plaintiff's physical therapist noted that plaintiff's original pain complaints began after stooping and bending "for long periods of time". There is no other mention of stooping in the medical records. Plaintiff never complained to Dr. Schultz that stooping caused her pain or that she was unable to stoop. The only allegation of an inability to stoop in the entire record is plaintiff's own testimony during the administrative hearing.

There is no credible evidence in this record supporting Dr. Schultz's finding that plaintiff can "never" stoop. No doctor has ever limited plaintiff's stooping. Dr. Schultz was never informed (at least until he filled out the Medical Source Statement in November 2003) that plaintiff had difficulty stooping. The substantial evidence supports the

75

ALJ's decision to discredit Dr. Schultz's opinion regarding plaintiff's ability to stoop, and it supports the ALJ's finding that plaintiff can stoop "occasionally."

### *Need to Lie Down*

Finally, Dr. Schultz found that plaintiff needs to lie down for 15 minutes every hour. The ALJ found no need to lie down during a normal eight-hour work day.

Once again, there is nothing in the record to support Dr. Schultz's finding. On February 7, 2003, plaintiff told her physical therapist that she could lie on her left side. On August 23, 2003, a physician's assistant recommended bed rest after he diagnosed plaintiff with the flu. He stated that plaintiff's flu should be cleared up within 48 hours. There is no other medical record recommending that plaintiff lie down during the day. Plaintiff did not even state to other doctors that she had a need to lie down during the day. There simply is no support in the record at all, much less in Dr. Schultz's medical records, to support his opinion that plaintiff needs to lie down for 15 minutes every hour during the day.

### *Conclusion*

Because Dr. Schultz's findings with regard to plaintiff's ability to lift, stand, walk, sit, and stoop and

76

her need to lie down are not supported by medical signs and
laboratory findings and are not consistent with the record
as a whole, the ALJ did not err in discounting Dr. Schultz's
opinion even though he was one of plaintiff's treating
physicians.  Therefore, plaintiff's motion for summary
judgment on this basis will be denied.

## VIII. LISTED IMPAIRMENT

Plaintiff argues that the ALJ "concluded that Ms.
Garrett's mental impairments were 'not severe' and did not
meet or equal a listing, but failed to discuss the Listings
addressing physical impairments."  In her opinion, the ALJ
found that plaintiff's impairments do not meet or equal a
listed impairment and noted that plaintiff's representative
did not contend that plaintiff's impairments meet or equal
any Listing.

Medical Listing 1.04A reads as follows:

Disorders of the spine (e.g., herniated nucleus
pulposus[23], spinal arachnoiditis[24], spinal stenosis[25],

---

[23]Herniated nucleus pulposus is a condition in which
part or all of the soft, gelatinous central portion of an
intervertebral disk is forced through a weakened part of the
disk, resulting in back pain and nerve root irritation.

[24]Arachnoiditis is a general term for several
progressive regional disorders all of which result in the
inflammation of parts of the middle membrane surrounding the

Case 3:04-cv-05067-REL   Document 17   Filed 08/16/05   Page 77 of 85

osteoarthritis[26], degenerative disc disease[27], facet

arthritis[28], vertebral fracture), resulting in compromise of

---

spinal cord and brain (arachnoid membrane) and the space
defined by this membrane (subarachnoid space). Either the
spinal cord or the brain may be involved; in some cases,
both are affected.

[25]Spinal stenosis is the narrowing of spaces in the
spine. This narrowing results in pressure on the spinal cord
and/or nerves.

[26]Osteoarthritis is a type of arthritis that is caused
by the break down and eventual loss of the cartilage of one
or more joints. Cartilage is a protein substance that serves
as a cushion between the bones of the joints.

[27]As a person ages, the water and protein content of
the body's cartilage changes. This change results in weaker,
more fragile and thin cartilage. Because both the discs and
the joints that stack the vertebrae (facet joints) are
partly composed of cartilage, these areas are subject to
wear and tear over time (degenerative changes). The gradual
deterioration of the disc between the vertebrae is referred
to as degenerative disc disease. Degeneration of the disc is
medically referred to as spondylosis. Spondylosis can be
noted on x-ray tests or MRI scanning of the spine as a
narrowing of the normal disc space between the adjacent
vertebrae.

[28]The facet joints are located in the back portion of
the spine. The joints combine with the disc space to create
a three-joint complex at each vertebral level. The facet
joint consists of two opposing bony surfaces with cartilage
between them and a capsule around it. The joint also has
fluid lubricating the joint. The combination of the
cartilage and the fluid allows the joint to move with little
friction. However, facet joint arthritis causes the
cartilage to breakdown and the joint movement is associated
with more friction. The patient loses motion, gets stiffer,
and has more back pain.

78

a nerve root (including the cauda equina[29]) or the spinal
cord. With: (A) evidence of nerve root compression by
neuroanatomic distribution of pain[30], limitation of motion
of the spine, motor loss (atrophy with associated muscle
weakness or muscle weakness) accompanied by sensory or
reflex loss and, if there is involvement of the lower back,
positive straight leg raising (sitting and supine).

Plaintiff argues that the conditions stated in the
first paragraph of 1.04 are not all-inclusive because the
discussion begins with "e.g." herniated nucleus pulposus,
etc. Plaintiff's argument is without merit. Regardless of
the type of disorder of the spine, the disorder must result
in compromise of a nerve root including the cauda equina or
the spinal cord.

Listing 1.04A initially requires a diagnostic imaging
test indicating a condition that results in nerve root
compression or spinal cord compression. The medically
determinable impairment must be indicated by an appropriate

---

[29]The spinal cord ends in the lumbar area and continues
through the vertebral canal as spinal nerves. Because of its
resemblance to a horse's tail, the collection of these
nerves at the end of the spinal cord is called the cauda
equina. These nerves send and receive messages to and from
the lower limbs and pelvic organs.

[30]Pain distributed throughout the nervous system.

diagnostic imaging test. Medically acceptable imaging techniques include x-ray imaging, CAT scans, CT scans, MRI scans, myelograms, and radionuclear bone scans. "Appropriate" means that the technique used is the proper one to support the evaluation and diagnosis of the impairment. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2002), Part A-1.00(c)(1).

On April 17, 2002, Dr. Cornelison diagnosed left acute S1 radiculopathy. Radiculopathy refers to pain that is felt at the nerve end as a result of nerve compression that occurs at the nerve root in the spinal column. However, plaintiff's radiculopathy was diagnosed after Dr. Cornelison performed a nerve conduction study, which is not an imaging technique. She noted on the same visit that plaintiff's x-rays (an imaging technique) were unremarkable. On April 25, 2002, Dr. Cornelison again diagnosed lumbosacral radiculopathy; however she reviewed no imaging studies, performed no exam, and recommended plaintiff have an MRI (an imaging study).

Subsequent to Dr. Cornelison's diagnoses, plaintiff was seen by Dr. McQueary. On June 17, 2003, Dr. McQueary reviewed plaintiff's MRI, myelogram, and CT scan (all appropriate imaging techniques) and found no signs of

80

neurologic compression.  On June 26, 2003, Dr. McQueary
again noted there were no signs of neurologic compression
anywhere.  On July 16, 2003, Dr. Weber noted that
plaintiff's MRI showed no specific nerve root compression.

There is no other evidence in the record regarding
nerve root compression or spinal cord compression.
Therefore, plaintiff is unable to satisfy her burden of
establishing the first requirement of Listing 1.04.

Because the ALJ properly found that plaintiff's
impairment did not meet listing 1.04 or any other listing,
plaintiff's motion for summary judgment on this basis will
be denied.

## IX.  DETERMINING PLAINTIFF'S RFC

Plaintiff argues that the ALJ relied on a Medical
Source Statement by a non-physician in determining
plaintiff's residual functional capacity.  This argument is
without merit.

On July 31, 2002, a counselor from SSA completed a
Physical Residual Functional Capacity assessment (Tr. at 75-
82).  Below is a comparison of that assessment and the
assessment of the ALJ:

|  | ALJ | Counselor |
|---|---|---|
| Lift occasionally | 20 pounds | 20 pounds |

81

| | | |
|---|---|---|
| Lift frequently | 10 pounds | 10 pounds |
| Stand | 4 hours with sit/ stand option every 45-60 minutes | 6 hours |
| Walk | 4 hours | 6 hours |
| Sit | 4 hours with sit/ stand option every 45-60 minutes | 6 hours |
| Push or pull | No limitation | Limited in lower extremities |
| Climb | Frequently | Frequently |
| Balance | Frequently | Frequently |
| Stoop | Occasionally | Occasionally |
| Kneel | Occasionally | Frequently |
| Crouch | Occasionally | Frequently |
| Crawl | Occasionally | Frequently |
| Unprotected heights | No significant exposure | Unlimited |
| Machinery | No significant exposure | Unlimited |
| Fumes, odors, dusts, gases, poor ventilation | Avoid | Unlimited |
| Vibration | Avoid | Avoid concentrated exposure |

Despite the many, many differences in the findings of
the counselor and those of the ALJ, plaintiff argues that
the ALJ must have relied on the counselor's findings because
only the counselor found that plaintiff could lift 20 pounds
occasionally and ten pounds frequently -- the exact findings

82

of the ALJ.

Plaintiff's ability to lift has been discussed at
length above. Dr. Cornelison limited plaintiff's lifting to
five pounds prior to her hysterectomy. Dr. Cornelison did
not restrict plaintiff's lifting other than that one time,
and plaintiff had a hysterectomy a few months later. Dr.
Schultz found that plaintiff could only lift five pounds,
but his opinion is not credible because it is not supported
by his own records, the records of any other treating
physician, or plaintiff's own reports to her doctors.

Although Dr. Weber found that plaintiff could lift five
pounds more than the ALJ found, that does not mean the ALJ
did not rely in part on Dr. Weber's findings. Plaintiff has
cited no regulation, and I am aware of none, which states
that an ALJ's findings must exactly match those of some
treating physician. The ALJ considered all of the credible
evidence in the record in making her determinations. She
specifically commented that this RFC assessment was done by
a non-physician and would not be accorded the weight given
to a doctor's opinion.

Because there is no evidence that the ALJ improperly
relied upon the RFC assessment completed by a counselor,
plaintiff's motion for summary judgment on this basis will

83

be denied.

## X.    ALJ'S MEDICAL OPINION VERSUS PHYSICIAN'S OPINION

Finally, plaintiff argues that "the only way an unfavorable decision could be rendered in this case would be for the Administrative Law Judge to literally ignore all of the substantial evidence of record demonstrating Ms. Garrett's significantly disabling impairments, while embracing assorted fragments of the record which tend to support the unfavorable decision.  Unquestionably the Administrative Law Judge substituted her own medical opinion in place of the opinions of the Drs. Schultz and Cornelison."  There is no other analysis of this argument.

I have found above that the ALJ properly discounted the November 25, 2003, opinion of Dr. Schultz.  I additionally found that the five-pound lifting restriction by Dr. Cornelison was a one-time restriction while plaintiff was being treated for ovarian cyst disease, a condition remedied by her hysterectomy.  Dr. Cornelison at no other time put ANY lifting restriction on plaintiff.  The ALJ properly found plaintiff's testimony and subjective allegations not credible.  And the ALJ properly found that plaintiff's impairment does not meet or equal a listed impairment. There simply is no error here by the ALJ, and therefore

84

plaintiff's argument that the ALJ had to have substituted her own opinion in order to reach this conclusion is without merit.

## XI. CONCLUSIONS

Based on all of the above, I find that the ALJ properly found that plaintiff's testimony was not credible, she properly discounted the opinion of Dr. Schultz, she did not err in declining to adopt the one-time lifting restriction imposed by Dr. Cornelison, she properly found that plaintiff's impairment does not meet or equal a listed impairment, there is no evidence that she adopted the findings of a non-physician, and there is no evidence that she substituted her own opinion and ignored the evidence in the record. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

_____/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 16, 2005

85